UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO. 3:24-cv-00428-WWB-PDB

REGENCY CENTERS CORPORATION,

      Plaintiff,

v.

INDIAN HARBOR INSURANCE COMPANY,

      Defendant.

_____/

## DEFENDANT INDIAN HARBOR INSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to Fed. R. Civ. P. 12(c), Defendant Indian Harbor Insurance Company ("IH"), hereby files this Motion for Judgment on the Pleadings and prays that this Court enter judgment in its favor.

In this lawsuit, Regency Centers Corporation ("Regency") seeks insurance coverage for clean-up expenses incurred in remediating two chemicals discovered at Regency's Blossom Valley, California shopping center (the "Site" or "Blossom Valley"). These chemicals, perchloroethene/tetrachloroethene ("PERC/PCE")[1] and trichloroethene ("TCE"), were discovered after Regency installed groundwater sampling points at the Site in anticipation of the expansion of a CVS pharmacy into a vacant store adjacent to the CVS, which previously had been used as a dry-cleaning business. An exclusion within the policy issued by IH to Regency (the "Policy"), however, expressly bars coverage for

_____

[1] Perchloroethene and tetrachloroethene are the same chemical but are referred to frequently by the abbreviations "PERC" or "PCE."

clean-up expenses discovered in this manner. This exclusion, the Policy's Site Development and Construction Activities Exclusion, broadly precludes coverage for certain chemicals where (as its title suggests) any remediation expense is directly or indirectly based upon or arising out of *any* site development *or* construction activities. This exclusion is broad and in clear and unambiguous language specifically defines "any site development or construction activities" to include any site investigations performed *in preparation for any site development or construction*.

Here, application of the Site Development and Construction Activities Exclusion is straightforward. Regency conducted testing at the site only after and because of CVS's request to expand its store, a construction and development project that would have involved, at minimum, reconfiguring the two stores through demolition of the dividing or demising wall between them. During this site investigation, Regency discovered PERC/PCE and TCE, chemicals plainly falling within the ambit of the Site Development and Construction Activities Exclusion. Because the plain language of the exclusion applies to the undisputed facts of Regency's claim for coverage, IH respectfully requests that the Court grant IH's motion for judgment on the pleadings.[2]

---

[2] If the Court rejects IH's arguments, the case would then proceed to discovery on all of the factual allegations of Regency's Complaint, all the coverage issues raised in this suit, and all of IH's defenses to coverage. IH respectfully reserves the right to bring other dispositive motions based on other defenses it has to Regency's complaint.

**DEFENDANT INDIAN HARBOR INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

## I.      BACKGROUND

### A.      The Underlying Site Investigation at Blossom Valley

Regency is a real estate development company that owns shopping centers throughout the country. *See, e.g.*, Policy, Endorsement 32, ECF No. 23-1 at 106-213 (listing Regency locations throughout the country).  In or around the end of 2021, Regency was engaged in lease negotiations with CVS, an existing tenant at Blossom Valley. 12-28-2022 Notice Email from Graham Smith, Compl., Exh. B, ECF No. 1. During those negotiations, CVS expressed interest in enlarging its Blossom Valley store by expanding its existing location into a vacant adjoining space. *Id.* CVS was aware that the adjoining space was previously utilized for dry-cleaning operations and requested that Regency perform testing before any development or construction began to ensure that the space was not contaminated with any substances that would pose a risk to human health. *Id.*

Regency, in preparation for the expansion and as part of its construction and development activities at the Site, performed site investigation work. *Id.* Specifically, "to satisfy the CVS demands, Regency initially installed two temporary ground water sampling points in the vicinity of the Vacant storefront in question." *Id.* One of the collected samples detected the presence of PERC/PCE. *Id.* After receiving the initial results, Regency undertook even more testing of soil-gas and sub-slab soil-gas samples. *Id.* Specifically, Regency's broker, Graham Smith, reported that "Regency collected further soil gas samples as well as indoor air samples" in Spring 2022 and December 2022 to determine "the extent of the environmental condition." *Id.*   Regency's broker, Robin

3

Kelliher, later reported that that the other contaminant of concern based on this site investigation was TCE.  Compl., Exh. D, ECF No. 1.

While Regency continued to conduct testing at Blossom Valley, Regency's environmental consultant, Terraphase, notified the local San Francisco Regional Water Quality Control Board ("RWQCB") of the findings at Blossom Valley. Complaint, ECF No. 1, Exhibit D.  In subsequent correspondence, the RWQCB notified Regency that elevated levels of PERC/PCE and TCE at Blossom Valley posed a potential threat to human health and that the RWQCB would be overseeing a cleanup and investigation of the property to be performed by Regency. *Id.*

## B.   The Policy

IH issued Environmental Real Estate Portfolio Policy No. PEC004659102 to Regency for the October 1, 2021 to October 1, 2024 Policy Period (the "Policy"). *See* Policy, Declarations, ECF No. 23-1 at 26. The Policy was issued by IH from its office in Pennsylvania to Regency in Florida. *Id.* at 11.

### 1.   The Insuring Agreement

Subject to its terms, conditions, and (as is particularly relevant here) exclusions, the Policy provides coverage for certain **Pollution Conditions**[3] as follows:

> We will pay on your behalf for **Pollution Loss,** as a result of a **Pollution Condition** on, at, under or migrating from **Your Location** . . . provided that: . . .
>
> **2.**   the **Pollution Condition** is first discovered by you during the **Policy Period** and reported to us, in writing, during the **Policy Period,** or, where applicable, the Extended Reporting Period.

---

[3] The Policy defines **Pollution Condition** in pertinent part as "the presence of any uncontrolled or uncontained **Pollutants** in land, the atmosphere, or any watercourse or body of water including groundwater . . . ." Policy, Section III.X., ECF No. 23-1 at 35-36.

4

*Id.*, Section I.A., ECF No. 23-1 at 30.

The Policy defines **Pollution Loss** in pertinent part as "**Remediation Expense** that is incurred with our prior written consent (such consent shall not be unreasonably withheld) . . . ." *Id.*, Section III.Y., ECF No. 23-1 at 36. **Your Location** means "any location listed in the Your Location(s) Schedule endorsed onto this Policy," which includes the Blossom Valley Shopping Center. *Id.*, Section III.HH., as amended by Endorsement No. 1, ECF No. 23-1 at 38, 51 (spreadsheet on file with IH). **Remediation Expense** means "reasonable and necessary expenses caused by a **Pollution Condition** incurred to investigate, assess, remove, dispose of, treat, contain or neutralize a **Pollution Condition** including any associated monitoring and testing costs, to the extent required by [governmental laws, regulations, or statutes]." *Id.*, Section III.AA., ECF No. 23-1 at 37.

### 2.    The Site Development and Construction Activities Exclusion

Assuming*, arguendo*, that coverage applies otherwise, the dispute here centers on whether the Site Development and Construction Activities Exclusion (the "Exclusion") precludes coverage. This Exclusion, provided at Endorsement 36 to the Policy, broadly excludes all coverage for *any* claim directly or indirectly based upon or arising out of *any* site development or construction activities, including *site investigations* performed in *preparation* for *any* site development or construction. The Exclusion notes that it only applies to **Pollutants** described in any documents listed in the Disclosed Document Schedule of Endorsement 32. The relevant documents listed in Endorsement 32 unequivocally include the **Pollutants** at issue here.[4]

---

[4] *See infra* at 21-23.  Regency does not contend otherwise.

Specifically, the Exclusion excludes coverage for "any **Claim, Pollution Loss, Emergency Remediation Expense** . . . directly or indirectly based upon or arising out of":

**Site Development and Construction Activities**

any site development or construction activities, including but not limited to:

1. geotechnical or any other site investigations performed in preparation for any site development or construction;

2. site grading;

3. razing and/or construction of any structures;

4. removal and/or disposal of any soil or other debris; or

5. dewatering.

This exclusion applies to any **Pollutants,** including any breakdown daughter or derivative products of such **Pollutants,** described in the documents listed in the Known Circumstances or Conditions Exclusion Amendment & Disclosed Document Schedule [Endorsement 32] endorsed onto this Policy, in or affecting all Media where such **Pollutants** is on, at, under or migrating from any location listed in the Your Location(s) Schedule endorsed onto this Policy . . . .

*Id.*, Section IV. as amended by Endorsement 36, ECF No. 23-1 at 38, 254.

The Policy provides coverage to Regency at a number of different locations—each with a distinct history of pollution.  Thus, as it explains in its plain language, the Exclusion references the "Known Circumstances or Conditions Exclusions Amendment & Disclosed Document Schedule" (the "Disclosed Document Schedule") to determine which particular **Pollutants** are noted in the "documents listed" for each location and thereby excluded. That Disclosed Document Schedule is found at Endorsement 32, which is organized by

6

particular location and which lists the specified "documents" that are relevant to each location. The Blossom Valley location lists the following documents:

Environmental Site Assessment, Blossom Valley Center, Mountain View, CA, 5/10/1996, AllWest

Case Closure, Shell Branded Service Station, Mountain View, CA, , 11/28/2011, CRA

Fuel Tank Investigation Case Closure, 1/19/2012, Santa Clara County

Remedial Action Certificate for Blossom Valley Dry Cleaners, mountain View, Santa Clara County, CA, 4/26/1996, California Regional Water Quality Board

DRAFT Phase I ESA; APEX; 12/12/16

*Id.*, Endorsement 32, ECF No. 23-1 at 136. The Environmental Site Assessments performed by both AllWest in 1996 and APEX in 2016 specifically describe the presence of PERC/PCE and TCE at the Blossom Valley location. *See*, *e.g.*, AllWest Environmental Site Assessment, ECF No. 24 at 59, Ex. A.; APEX Phase I ESA, ECF No. 24 at 109, Ex. B. Additionally, the 1996 Remedial Action Certificate from the California Regional Water Quality Board describes the presence of PERC/PCE. *See* Remedial Action Certificate, ECF No. 23-3 at 7. Therefore, the documents listed in the Disclosed Document Schedule describe the very pollutants for which Regency seeks coverage and Regency does not allege to the contrary. *See* Compl. ¶ 27, ECF No. 1 ("Plaintiff Regency Centers disclosed to Defendant Indian Harbor the Blossom Valley Shopping Center and the dry cleaner condition prior to the Policy's inception[.]").

## C.    Reporting and Denial of Coverage

On December 28, 2022, Regency, through its broker Graham Smith, provided its notice to IH via email. 12-28-2022 Notice Email from Graham Smith, Compl., Exhibit B, ECF No. 1. Specifically, in this very first communication regarding the matter, Mr. Smith,

7

on behalf of Regency, explained how Regency had discovered the contamination: "CVS was interested in expanding its leased storefront space into a vacant storefront space located adjacent to the CVS . . . and requested Regency provide confirmation that conditions in the space in question would not pose an environmental risk to human health. In order to satisfy the CVS demands, Regency installed two temporary ground water sampling points in the vicinity of the vacant storefront in question."[5]

On May 15, 2023, IH wrote to inform Regency that coverage was not available for any potential loss associated with PERC/PCE or TCE at Blossom Valley because the Site Development and Construction Activities Exclusion precluded coverage for Regency's claim under the Policy. Compl., Exh. C, ECF No. 1. Following requests by Regency for reconsideration, IH wrote again on July 19, 2023 and September 20, 2023 to respectfully inform Regency that it maintained its prior position on this matter and another claim.[6] *Id.* Although a call to discuss the Exclusion was scheduled, Regency abruptly cancelled that intended conference. IH Answer, Exhibit B, ECF No. 23-2 at 2.  Without any further communication, Regency then responded by filing this lawsuit.

## II.    ARGUMENT

The Site Development and Construction Activities Exclusion is dispositive of this action.  To trigger the Exclusion, IH must show first that Regency's claim directly or

---

[5] Mr. Smith indicated that PERC/PCE was one contaminant of concern.  In a subsequent correspondence, broker Robin Kelliher, again on behalf of Regency, asserted that the other contaminant of concern was TCE.  Compl., Exh. D, ECF No. 1.

[6] IH denied coverage for the other claim based, in part, on the same Site Development and Construction Activities Exclusion.  Although it initially disputed IH's denial of both claims, Regency now disputes only the denial for the Blossom Valley location. This other Site—Point Loma—is addressed in the letters attached hereto but is *not* a subject of dispute between the parties.

indirectly is based upon or arises out of "any site development or construction activities," which are specifically defined to include, *inter alia*, "any [] site investigation[] performed *in preparation for any site development or construction*." Policy, Section IV. as amended by Endorsement 36, ECF No. 23-1 at 38, 254 (emphasis added). The undisputed facts neatly fit the language of the exclusion.  Property owner Regency was preparing to expand CVS's strip mall location into a neighboring property to make the CVS larger and, before doing so, engaged in certain environmental testing at the site.  Thus, Regency was engaged in site development and/or construction activities, including because (in the language of the Exclusion) it was investigating the site in preparation for development and construction. As such, IH need then only show that the **Pollutants** at issue were described in the Disclosed Document Schedule of Endorsement 32.  They were.  Plainly and explicitly.  Based on the Policy language and these undisputed facts, IH respectfully requests that the Court grant this motion.

### A.    Legal Standard

The standard of review for a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) "is almost identical to that used to decide motions to dismiss."  *GEICO Marine Ins. Co. v. Baron*, 426 F. Supp. 3d 1263, 1264 (M.D. Fla. 2019). To survive a 12(c) motion, "the complaint must contain enough facts to state a claim for relief that is plausible on its face." *Steffens v. Nocco*, No. 8:19-CV-1940-KKM-AAS, 2021 WL 3666315, at *1 (M.D. Fla. Aug. 18, 2021). Although this Court must view the well-pled facts in the complaint in the light most favorable to the non-moving party, this Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Cafe Int'l Holding Co. LLC v. Chubb Ltd.*, No. 21-11930, 2022 WL 1510441, at *1 (11th Cir. May 13, 2022) (*quoting Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Judgment "is appropriate where there are no material

facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001).[7]

### B.    Choice of Law

A federal court sitting in diversity applies the choice of law rules of the forum state. *See Nationwide Mut. Ins. Co. v. Nelson*, 369 F. Supp. 3d 1249, 1259 (M.D. Fla. 2018). Under Florida choice of law rules, "Florida courts resolving contract-interpretation disputes have traditionally applied the doctrine of *lex loci contractus,* requiring a court to follow the law of the state where the contract was made or to have been performed in interpreting the contract." *Am. Home Assurance Co. v. Peninsula II Devs., Inc.*, No. 09-23691-CIV, 2010 WL 11451835, at *3 (S.D. Fla. Oct. 19, 2010). The *lex loci contractus* rule, "as applied to insurance contracts, provides that the law of the jurisdiction where the contract was *executed* governs the rights and liabilities of the parties in determining an issue of insurance coverage." *Pierce v. Prop. & Cas. Ins. Co. of Hartford*, 303 F. Supp. 3d 1302, 1305 (M.D. Fla. 2017) (*quoting State Farm Mut. Auto. Ins. v. Roach*, 945 So.2d 1160, 1163–64 (Fla. 2006)) (emphasis in original). This requires "a determination of where the last act necessary to complete the contract was done." *Id.* Ordinarily, the "last act necessary to complete a contract is the offeree's communication of acceptance to the offeror." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093

---

[7] On a 12(c) motion, this Court is bound to consider the pleadings, as well as any documents incorporated by reference therein where "the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). A document is undisputed when the parties do not challenge the document's authenticity (even if they disagree regarding its legal meaning). *Id.* Accordingly, documents attached to an Answer "should be considered as part of the pleadings for Rule 12(c) purposes" where, as here, neither party challenges their authenticity or their centrality to the Plaintiff's claim.

(11th Cir. 2004); *accord Pierce*, 303 F. Supp. 3d at 1305 (finding that the last act necessary is "an insurer's (or its agent's) communication of acceptance of the insured's (or its agent's) offer to purchase insurance.").

Florida courts generally find that an insurance contract either was executed in the state from where it was sent by the insurer or the state to which it was sent by the insurer to the insured. *Compare Pierce*, 303 F. Supp. 3d at 1305 (finding that Connecticut law applied to interpretation of policy involving real property located in Georgia because oral binder was communicated from insurer's office in Connecticut to the insureds in Florida) *with Sparta Ins. Co. v. Colareta*, 990 F. Supp. 2d 1357, 1362 (S.D. Fla. 2014) (finding that the law of the state where policy was delivered applies).

Here, the Policy was signed and dispatched from IH's office in Exton, Pennsylvania and sent to Regency in Florida. Policy, ECF No. 23-1 at 11. IH cites to the law of both states here because the decisional law of both states on the issues presented by this motion is identical.[8]

Under either Pennsylvania or Florida law, courts enforce the unambiguous terms of an insurance policy. *Rosenberg v. Hudson Ins. Co.*, 638 F. Supp. 3d 510, 516 (W.D. Pa. 2022); *Dodge v. People's Tr. Ins. Co.*, 321 So. 3d 831, 833 (Fla. 4th DCA 2021). The policy must be construed as a whole and undefined terms are given their plain and ordinary meaning. *Cap. Flip, LLC v. Am. Mod. Select Ins. Co.*, 416 F. Supp. 3d 435, 438 (W.D. Pa. 2019); *Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017). The

---

[8] Regency asserts that Florida law applies to this dispute. *See* Compl., ECF No. 1, ¶ 7. IH reserves the right to assert that one state's law definitively applies to the extent that the relevant state's laws would lead to different results for a particular issue. This hypothetical is not present here.

language of the policy "may not be stretched beyond its plain language to create an ambiguity" and simple "disagreement between the parties about the meaning does not make the policy language ambiguous." *ATCM Optical, Inc. v. Twin City Fire Ins. Co.*, 513 F. Supp. 3d 513, 518 (E.D. Pa. 2021); *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002) (the "terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced or unrealistic construction."). This is especially true where the insured is a sophisticated party that negotiated and eventually accepted the unambiguous language of the policy. *Direct Gen. Ins. Co. v. Indian Harbor Ins. Co.*, 661 F. App'x 980, 985 (11th Cir. 2016) (finding no error where the trial court "referred to Direct's sophistication in explaining why Direct should be held to the unambiguous terms of the policy."); *JEP Mgmt., Inc. v. Fed. Ins. Co.*, No. 4170, 2006 WL 2372961, at *3 (Pa. Com. Pl. Aug. 8, 2006) ("The policy language is clear and unambiguous. Plaintiffs, commercial insureds, were represented by Graham, a sophisticated insurance broker.").

Both states also agree that the interpretation of an insurance policy is a pure question of law for this Court to decide and where the unambiguous language of the policy precludes coverage, the insurer is entitled to judgment as a matter of law. *Leithbridge Co. v. Greenwich Ins. Co.*, 464 F. Supp. 3d 734, 738 (E.D. Pa. 2020) ("Courts may therefore dispose of such cases on motions for judgment on the pleadings where the sole issue is the interpretation of the policy."); *Pac. Emps. Ins. Co. v. Wausau Bus. Ins. Co.*, No. 3:05-CV-850-J-32TEM, 2007 WL 2900452, at *4 (M.D. Fla. Oct. 2, 2007).

**C.    Coverage Is Barred Pursuant to the Site Development and Construction Activities Exclusion.**

The Site Development and Construction Activities Exclusion bars coverage for Regency's claim. Under its plain terms, the Exclusion precludes coverage for any claim arising out of any of *three* different relevant activities. First, the Exclusion bars coverage for "*any* . . . site investigation[] performed *in preparation for any site development or construction*." Policy, Section IV. as amended by Endorsement 36, ECF No. 23-1 at 254 (emphasis added). Second, the Exclusion precludes coverage for broader "construction activities." *See id.* Third, and finally, the Exclusion also precludes coverage for "site development." *See id.* To prevail here, IH may show that any one of these three facets of the Exclusion apply; Regency must satisfactorily address all three.

Once the Exclusion is triggered by application of one of the activities described above, the Exclusion applies to "any **Pollutants,** including any breakdown daughter or derivative products of such **Pollutants**" listed in the Disclosed Document Schedule of Endorsement 32. *Id.*

Both of the Exclusion's requirements are thus met: (1) this is a purported claim arising out of any site development or construction activities (including because it arises out of a site investigation performed in preparation for site development or construction); and (2) Regency seeks coverage in connection with PERC/PCE and TCE—pollutants that were described in the Disclosed Document Schedule of Endorsement 32.

     **1.**       **Regency's Request for Coverage Arises Out of the Site Development and Construction Activities at the Shopping Center and Is Excluded by the Policy.**

           **a.**       **The Exclusion's Language Is Broad and Should Be Interpreted According to Its Terms.**

As an initial matter, the Court should interpret the Site Development and Construction Activities Exclusion with reference to the broad and expansive prefatory language it uses. In that regard, the Exclusion bars coverage for "*any* **Claim, Pollution Loss, Emergency Remediation Expense** . . . *directly or indirectly based upon or arising out of*" the terms of the Exclusion. Policy, Section IV. as amended by Endorsement 36, ECF No. 23-1 at 38, 254 (emphasis added).

These prefatory terms are interpreted in broad fashion under both Pennsylvania and Florida law. *See, e.g.*, *Rosenberg v. Hudson Ins. Co.*, 638 F. Supp. 3d 510, 520 (W.D. Pa. 2022) ("Pennsylvania courts interpret the phrase 'arising out of' in policy exclusions in a very broad manner . . . ."); *Taurus Holdings Inc. v. USFG*, 913 So. 2d 528, 539-40 (Fla. 2005) ("The term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'"); *In re Belefski's Est.*, 413 Pa. 365, 375, 196 A.2d 850, 855 (1964) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive."); *Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003) ("any" means "one or another without restriction or exception").

Collectively, these terms make clear that ALL claims having ANY relation or connection to "site development or construction activities" are excluded from coverage. *Westport Ins. Corp. v. Hippo Fleming & Pertile L. Offs.*, 791 F. App'x 321, 323 (3d Cir. 2019) (construing exclusion with prefatory language "based upon, arising out of,

attributable to or directly or indirectly resulting from" as broadly barring coverage for any claim bearing any direct or indirect relation to the excluded conduct).

> **b.    Regency's Investigatory Work for the CVS Expansion Constitutes a "Site Investigation Performed In Preparation For Any Site Development or Construction."**

The Site Development and Construction Activities Exclusion unsurprisingly excludes what its very title suggests—site development and construction activities—and specifically includes:

> geotechnical or *any other site investigations performed in preparation for any site development or construction*.

Policy, Section IV. as amended by Endorsement 36, ECF No. 23-1 at 254 (emphasis added).

Plainly, Regency engaged in site investigations. Indeed, there is no dispute that Regency engaged in sampling and testing by "install[ing] two temporary ground water sampling points in the vicinity of the Vacant storefront in question." Compl., ¶ 16, ECF No. 23-2. In other words, Regency conducted a "site investigation" to determine the suitability of the dry-cleaning space for the CVS expansion.

Moreover, there can be no reasonable dispute that the admitted investigation was undertaken "in preparation for . . . site development or construction," thereby fully meeting the Exclusion's language. Indeed, as Regency has itself admitted when it provided notice of the claim, its discovery of pollutants occurred only because of investigatory work after "lease discussions with its tenant CVS . . . related to CVS' interest in expanding its leased storefront space into an adjacent vacant storefront space." *See* Compl. ¶ 15, ECF No. 1.; *see also* Compl. ¶¶ 16-17 (explaining that sampling points were installed in response to the CVS request to expand). The planned work would require, at a minimum, demolition

of the dividing wall between the stores, removal of any remaining fixtures in the former dry-cleaning space, and erection of new interiors and fixtures designed to fit CVS's needs, lighting and style.   Under any common-sense view, this contemplated scope of work constitutes "construction" or "site development."  Terms such as "construction" and "site development" in an insurance policy are interpreted according to their natural and ordinary meaning. *Rosenberg v. Hudson Ins. Co.*, 638 F. Supp. 3d 510, 515 (W.D. Pa. 2022) ("Pennsylvania courts give words of common usage their natural, plain, and ordinary sense.") (internal quotation omitted); *Nateman v. Hartford Cas. Ins. Co.,* 544 So.2d 1026, 1028 (Fla. 3d DCA 1989) ("When a policy provision remains undefined, common everyday usage determines its meaning.").

The few courts to have analyzed the definition of "construction" in the context of insurance policies agree with IH's position. For example, in *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19 (2006), the California Supreme Court addressed the meaning of the term "under construction" in the context of an exception to a vacancy exclusion in a commercial property policy under similar circumstances to here. There, the insured, during the period of vacancy, hired "a general contractor to transform the building into a 'leasable shell,' in which many of the interior nonsupporting walls would be removed so that the space could be refashioned to suit a particular tenant's needs." *Id.* at 24. Applying the plain language of the exclusion, the court found that these activities constituted "construction" because they were "substantial improvements or modifications to an existing structure[.]" *Id.* at 28. *See also Crescent Beach Club LLC v. Indian Harbor Ins. Co.*, 468 F. Supp. 3d 515, 548-49 (E.D.N.Y. 2020) (applying exclusion for construction services where work involved dismantling and rebuilding the rotted portions of a wood

16

pergola structure that was already in existence because such work extended beyond "routine maintenance").

Relevant statutory definitions and frameworks also are persuasive. *See*, *e.g.*, 35 Pa. Stat. Ann. § 755.3 (defining construction to mean, in relevant part, "the . . . expansion, remodeling, alteration, modernization, or extension of existing structures"); Fla. Stat. Ann. § 255.072 (defining "construction services" as "all labor, services, and materials provided in connection with the construction, alteration, repair, demolition, reconstruction, or any other improvements to real property."); 42 U.S.C.A. § 2005e (defining "construction" to mean "expansion, remodeling, and alteration of existing buildings"). Quite simply, the site investigation work at Blossom Valley was performed in preparation for "construction" at the site.

Regency has previously argued that the Site Development and Construction Activities Exclusion could not apply because CVS abandoned its proposed expansion project and thus the contemplated construction work did not take place. Compl., Ex. D, June 28, 2023 Correspondence from Robin Kelliher, ECF No. 1. This fact is of no moment because the Exclusion applies to "any . . . site investigations performed *in preparation for* any site development or construction." Policy, Section IV. as amended by Endorsement 36, ECF No. 23-1 at 254 (emphasis added). Thus, the Exclusion is not limited to initiated site development/construction activities or completed site development/construction activities. Regency's argument would impermissibly add an additional requirement into the language of the Exclusion.[9]

---

[9] *See Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. Ct. 2007) ("If the terms of a policy are clear, this Court cannot rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used."); *State Farm Fire &*

17

Just as whether or not Regency completed the planned construction is irrelevant, so too is whether or not a government agency subsequently required further investigation and remediation. Any governmental requirements imposed against Regency came about only because Regency voluntarily conducted its initial site investigation in preparation for private site development or construction and reported the results to the local Regional Water Quality Control Board. *See* Compl., Ex. D, June 28, 2023 Correspondence from Robin Kelliher, ECF No. 1. Quite simply, these requirements would "directly or indirectly" be "based upon or arising out of" the initial site investigation that implicates the exclusion. As such, they too are excluded.

### c.    In Addition to a Site Investigation, Regency's Work More Broadly Constituted Excluded "Construction Activities."

As demonstrated in Section b above, Regency's sampling work was a site investigation performed in *preparation* for any site development or construction. As such, the work meets the Exclusion's test. But even were the Court to somehow hold that the sampling work does not constitute an excluded site investigation in preparation for site development or construction, the work also separately qualifies under the Exclusion's broader verbiage of "any" "construction activities," a term that extends beyond "site investigations" performed in preparation for construction.

Construction "activities," of course, is necessarily broader than mere construction. As is relevant here, those "activities" include not just the investigation work conducted by Regency. In interpreting the meaning of these words of common and everyday usage,

---

*Cas. Ins. Co. v. Wilson*, 330 So. 3d 67, 72 (Fla. 2nd DCA 2021) ("We are not empowered to rewrite an insurance policy to relieve one party from the apparent hardship of an improvident bargain[.]").

18

this Court need not adopt an artificially narrow interpretation that defies common sense. *Universal Teleservices Arizona, LLC v. Zurich Am. Ins. Co.*, 879 A.2d 230, 233 (Pa. Super. 2005) ("No matter how the plaintiffs try to torture the language of the policy, the plain language of the exclusion and the common sense interpretation of the exclusion make it applicable to the facts at hand."); *Miglino v. Universal Prop. & Cas. Ins. Co.*, 174 So. 3d 479, 482 (Fla. 4th DCA 2015) (explaining that a court need not adopt an overly rigid interpretation of a policy exclusion where "[c]ommon sense and common meaning dictate otherwise.").

Courts have construed construction activities to include work that is incidental to the physical acts of building a structure. *See, e.g., Air Engineers, Inc. v. Com.*, 40 Pa. Cmwlth. 472, 476–77, 397 A.2d 854, 855–56 (1979) (Interpreting regulation providing that "[e]xamples of construction activities include: Erecting a building; constructing a bridge or road; installing tile or terrazzo; painting a building; repairing a roof; landscaping or planting trees or grass; repairing spouting, faucets, furnaces or plaster; laying brick or stone; excavating a cellar; paper hanging; replacing a window pane; installing a kitchen cabinet; moving a building; installing or replacing electrical outlets"); *State ex rel. Lamp. v. J.A. Croson Co.*, 661 N.E.2d 724, 727 (Ohio 1996) (interpreting statute which defined "construction activities" as "'demolition, dismantling, excavation, construction, [and] erection of buildings and other structures and the installation of machinery or equipment,' or any activity that is performed 'in connection therewith'" and reasoning that transportation of construction materials from off-site fell within that definition because holding otherwise "would require us to rewrite the rule and add a preparatory-activities

19

exception").[10] In short, even if this Court was unsure that the prefatory testing mean was not a site investigation "performed in preparation for any site development or construction" as argued above in Section II.C.1.b., surely the claim is "directly or indirectly based upon or arising out of" the broad phrase "any" "construction activities" and must be excluded.

> **d.    Alternatively, Regency's Work Also Constituted "Site Development."**

In addition to the Exclusion's application to "any" "construction activities" as well as any "site investigations performed in preparation for any site development or construction," the Exclusion also plainly bars coverage for another group of excluded items: "site development." This term includes items beyond preparations and encompasses a host of tasks that develop a property. *Rosenberg*, 638 F. Supp. 3d at 515 ("Pennsylvania courts give words of common usage their 'natural, plain, and ordinary sense.'"); *Nateman*, 544 So.2d at 1028 ("When a policy provision remains undefined, common everyday usage determines its meaning."). The root word "develop" in its ordinary sense means "to expand by a process of growth." *Develop*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/develop (last visited August 15, 2024). The Cambridge Dictionary similarly defines "develop" to mean "to []

---

[10] Although no Florida court appears to have yet addressed the precise meaning of the term "construction activities," at least one Florida decision contemplates that "construction activities" occurred, like here, in the course of the *expansion* of a hospital building to add additional stories. *Armenteros v. Baptist Hosp. of Miami, Inc.*, 714 So. 2d 518, 520 (Fla. 3d DCA 1998). Additionally, Florida statutory law interprets the term "activities" to constitute a modifier that broadens the preceding term to include actions that are incidental or related to that preceding term. *See, e.g.*, Fla. Stat. Ann. § 253.68 ("'Aquaculture activities' means any activities, as determined by board rule, related to the production of aquacultural products[.]"); Fla. Stat. Ann. § 215.473 ("'Mineral-extraction activities' include the exploring, extracting, processing, transporting, or wholesale selling or trading of elemental minerals or associated metal alloys or oxides (ore) . . . as well as facilitating such activities[.]").

grow or change into a more advanced, larger, or stronger form." *Develop*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/develop (last visited August 15, 2024).

Here, the environmental testing was site development within a project that would have developed the CVS site into a larger, more expansive store by growing the CVS footprint into the adjacent dry-cleaning space. That is, this was an activity that was part of "development" of the Blossom Valley CVS by growing and expanding the Site into a vacant, abandoned store space. Courts agree with this interpretation. *See DIV Sumner St., LLC v. Great Am. E&S Ins. Co.*, No. SUCV201901498BLS1, 2020 WL 2197899 (Mass. Super. Feb. 7, 2020) (finding sampling and remediation work to constitute site development); *see also O'Neil v. Walton Cnty.*, 149 So. 3d 699, 705–06 (Fla. 1st DCA 2014) (explaining that the statutory term "development" is broadly construed and includes "any building activity" or "change in the intensity of use of land . . . ."; *see also* Va. Code Ann. § 2.2-2760 ("Site development activities include clearing, grading, improving drainage, constructing pads, ***mitigating environmental concerns***, providing road or rail access to the site, securing rights-of-way and easements, extending utilities to the site, and undertaking other similar activities.") (emphasis added).

Here, then, Regency's claim is "directly or indirectly based upon or arising out of" "site development" within the plain meaning of that term, and, thus, implicates the Exclusion as well.

### 2.    PERC/PCE and TCE Are Subject to the Exclusion.

As explained above, IH meets the first part of the Exclusion's test because Regency's claim for coverage is "directly or indirectly based upon or arising out of . . . any site development or construction activities, including but not limited to . . . site

investigations performed in preparation for any site development or construction."  IH meets the second part of the Exclusion's test because the PERC/PCE and TCE constitute "any **Pollutants,** including any breakdown daughter or derivative products of such **Pollutants,** described in the documents listed in the [Disclosed Document Schedule] endorsed onto this Policy[.]"[11] The Disclosed Document Schedule is included at Endorsement No. 32 to the Policy and includes two columns:  one specifies the relevant location and the second specifies the relevant documents. Specifically, Endorsement No. 32 provides, in relevant part, as follows:

> Only conditions described in the documents listed in the Disclosed Document Schedule below are considered disclosed to us . . .
>
> <u>Disclosed Document Schedule:</u>

| **Your Location** | Document(s) |
|---|---|
| | *     *     * |
| Blossom Valley 1710 Miramonte at Cuesta Mountain View, CA, 94040 | Environmental Site Assessment, Blossom Valley Center, Mountain View, CA, 5/10/1996, AllWest |
| | Case Closure, Shell Branded Service Station, Mountain View, CA, 11/28/2011, CRA |
| | Fuel Tank Investigation Case Closure, 1/19/2012, Santa Clara County |
| | Remedial Action Certificate for Blossom Valley Dry Cleaners, mountain View, Santa Clara County, CA, 4/26/1996, California Regional Water Quality Board |
| | DRAFT Phase I ESA; APEX; 12/12/16 |

---

[11] In the past, Regency has argued that enforcement of the Exclusion somehow would render coverage illusory, but the limitation of enforcement to only certain pollutants makes such an argument specious.

Policy, Endorsement 32, ECF No. 23-1 at 106, 136.  The Blossom Valley location appears on page 31 of the endorsement and, as set forth above, there are five documents listed for that location. *Id.* at 136.

According to the Site Development and Construction Activities Exclusion, if a **Pollutant** is "described in the documents" referenced in Endorsement 32, the Exclusion applies to that particular **Pollutant** (assuming, as demonstrated above, that it was discovered during "any site development or construction activities, including but not limited to . . . any other site investigations performed in preparation for any site development or construction" at the Blossom Valley location).  Here, no fewer than three of the documents describe the presence of PERC/PCE and TCE.  *See* Remedial Action Certificate, ECF No. 23-3 at 7 (acknowledging presence of PERC/PCE); AllWest Environmental Site Assessment, ECF No. 24 at 59, Ex. A. (acknowledging presence of PERC/PCE and TCE); APEX Phase I ESA, ECF No. 24 at 109, Ex. B (acknowledging presence of PERC/PCE).  Notably, Regency itself does not contend otherwise, directly conceding that this relevant information was previously disclosed. *See* Compl. ¶ 27, ECF No. 1 ("Plaintiff Regency Centers disclosed to Defendant Indian Harbor the Blossom Valley Shopping Center and the dry cleaner condition prior to the Policy's inception[.]").  Accordingly, coverage is barred for the PERC/PCE and TCE that was discovered at Blossom Valley.

III.    **CONCLUSION**

This matter bristles with simplicity. The language of the Site Development and Construction Activities Exclusion broadly excludes pollutants that the insured already listed as present at the property if the discovery was triggered by any site development or construction activities, including but not limited to any site investigations performed in

preparation for any site development or construction. That is exactly what happened here.

For all of the foregoing reasons, IH respectfully requests that this Court grant IH's Motion for Judgment on the Pleadings and enter judgment in favor of IH on Counts I (Declaratory Relief) and II (Breach of Contract) of Regency's Complaint as Regency is not entitled to coverage under the plainly applicable Policy language.

Respectfully submitted,

**AKERMAN LLP**
98 Southeast Seventh Street, Suite 1100
Miami, FL  33131
Telephone:  (305) 374-5600
Facsimile:  (305) 374-5095

By: s/ Antonio D. Morin
     Antonio D. Morin
     Florida Bar No. 187860
     Primary e-mail: antonio.morin@akerman.com
     Gideon Reitblat
     Florida Bar No. 36388
     Primary e-mail: gideon.reitblat@akerman.com

             AND

Daniel W. Cohen, Esq.
Troutman Pepper Hamilton Sanders LLP
875 Third Avenue
New York, New York 10022
Telephone No. (212) 704-6256
Facsimile No. (757) 687-7510
Email:    daniel.cohen@troutman.com

*Attorneys for Defendant, Indian Harbor Insurance Company*

24

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court this 2nd day of October, 2024 by using the CM/ECF system which will send a notice of electronic filing to the following:    (jtucker@foley.com; avwilliams@foley.com; ehorner@foley.com; vmontejo@foley.com) John Tucker, Esq., Emily Friend Horner, Esq., Foley & Lardner LLP, One Independent Drive, Suite 1300, Jacksonville, FL 32202-5017.


                              s/ Antonio D. Morin
                              Attorney